## DISTRICT COURT OF THE VIRGIN ISLANDS
## DIVISION OF ST. CROIX

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | **Criminal Action No. 2011-09** |
| **RASHEED DAVID,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| _____ | ) | |

**Attorneys:**
**Denise A. Hinds, Esq.,**
St. Croix, U.S.V.I.
    *For the United States*

**Patricia Schrader-Cooke, Esq.,**
St. Croix, U.S.V.I.
    *For the Defendant*

## MEMORANDUM OPINION

**Lewis, District Judge**

THIS MATTER comes before the Court on Defendant Rasheed David's "Motion for Judgment of Acquittal or in the Alternative New Trial," which was filed on November 29, 2011. (Dkt. No. 82). The Government filed an opposition on December 12, 2011, (Dkt. No. 84), and Defendant filed his reply memorandum on December 22, 2011, (Dkt. No. 90). The Government amended its Opposition to provide citations to the record on February 7, 2012. (Dkt. No. 107). For the reasons discussed below, the Court will deny Defendant's Motion.

## I.    BACKGROUND

On May 17, 2011, Rasheed David and Damion Barrett were indicted for conspiracy with intent to distribute more than 500 grams of cocaine, in violation of 21 U.S.C. §§ 841 and 846,

and possession with intent to distribute more than 500 grams of cocaine, in violation of 21 U.S.C. § 841. (Dkt. No. 1). On June 28, 2011, Defendant David moved to sever the cases. (Dkt. No. 21). On July 11, 2011, the Court granted the Motion to Sever. (Dkt. No. 30).

A jury trial as to Defendant David began on November 2, 2011. Defendant David made a Motion for Acquittal pursuant to Federal Rule of Criminal Procedure 29 at the conclusion of the Government's case-in-chief, which the Court denied. Defendant also moved for acquittal after the close of his defense, which the Court also denied. On November 5, 2011, the jury returned a verdict of guilt on both counts. (Dkt. No. 71).

On November 14, 2011, Defendant David filed a "Motion for Judgment of Acquittal" and an "Amended Motion for Judgment of Acquittal." (Dkt. Nos. 74 & 75).[1] The Amended Motion stated that Defendant was moving for a judgment of acquittal and new trial under Federal Rules of Criminal Procedure 29 & 33, but that he would file a supporting memorandum within 14 days of receiving the trial transcript. (Dkt. No. 75). Three trial transcripts were docketed on November 15, 2011. (Dkt. Nos. 77-79). The Court construed the Amended Motion as a request for an extension of time for Defendant David to file his Motion for Acquittal, and on November 23, 2011, issued an order granting Defendant up to and including November 29, 2011, within which to file a Memorandum in support of his Motion for Judgment of Acquittal or in the Alternative New Trial. (Dkt. No. 80).

On November 29, 2011, Defendant David filed the indicated Memorandum (Dkt. No. 82), together with an Appendix with most of the trial transcript. (Dkt. No. 83).[2] The

---

[1]      The only apparent difference between these two filings is that Defendant Damion Barrett's name does not appear in the caption of the Amended Motion for Judgment of Acquittal.

[2]      The Appendix includes opening arguments, trial testimony, Motion for Acquittal arguments, and closing arguments. It does not include voir dire of the jury panel and sidebar

Government filed its Opposition on December 12, 2011, (Dkt. No. 84), and Defendant David

filed his Reply on December 22, 2011.  (Dkt. No. 90).  On February 7, 2012, the Government

amended its Opposition to provide citations to the record.  (Dkt. No. 107).[3]

## II.   MOTION FOR ACQUITTAL

### A.  Applicable Legal Principles

A motion for a post-verdict judgment of acquittal under Federal Rule of Criminal

Procedure 29(c) requires the Court to "review the record in the light most favorable to the

prosecution to determine whether any rational trier of fact could have found proof of guilt

---

conferences held during the trial.  Transcripts of those proceedings appear on the docket as
Docket Nos. 87-89.

[3]       In its Opposition filed on December 12, 2011, the Government stated that "the transcript
relied upon by the defense is not an official transcript. The Government has reviewed same and
has found it to be profoundly inaccurate and at times excruciating to read. The Government will
not be relying upon it in its responsive pleading."  (Dkt. No. 84 at 1).  On January 26, 2012, the
Court issued an Order finding that Defendant had relied on an unofficial transcript and ordered
the Government to submit a memorandum "explaining, with specificity, the basis for its
allegations that the transcript is 'profoundly inaccurate and at times excruciating to read,' with
particular emphasis on the alleged inaccuracies." (Dkt. No. 101).  On February 3, 2012, the
Government responded with a memorandum explaining that "[a]fter a sifting review of the entire
trial (except sidebar discussions and jury instructions) the Government has found that the
transcript was at time inaccurate . . . However, the inaccuracies were not substantive and did not
effect [sic] the import of the evidence elicited."  (Dkt. No. 104 at 2).  Included with that
memorandum was a redlined version of the transcript in the Appendix, proposing non-
substantive changes to sixty (62) pages of the transcript. (*See* Redlined Appendix (hereinafter
"App.") Dkt. Nos. 104-1, 104-2, and 104-3).  The Government then refiled its Opposition on
February 7, 2012, with cites to the Redlined Appendix.  (Dkt. No. 107).

On February 14, 2012, Defendant filed a memorandum stating that he concurred with the
changes proposed in the Redlined Appendix and proposed seven more non-substantive changes.
(Dkt. No. 110).  The Government has not filed an opposition to these seven proposed changes.
Additionally, on February 10, 2012, the Defendant moved to designate the Appendix as the
official transcript under 28 U.S.C. § 753(b).  (Dkt. No. 109).  After considering Defendant's
Motion to Designate and reviewing the Redlined Appendix together with the additional changes
proposed by the Defendant, the Court entered an Order dated June 4, 2012, granting in part and
denying in part the Motion and designating as official the Redlined Appendix (Dkt. Nos. 104-1,
104-2, and 104-3) as amended by the changes proposed by Defendant in Dkt. No. 110. (*See* Dkt.
No. 112).

beyond a reasonable doubt based on the available evidence." *United States v. Wolfe*, 245 F.3d 257, 261 (3d Cir. 2001); *see also United States v. Salmon,* 944 F.2d 1106, 1113 (3d Cir. 1991) (Court must "determine whether a reasonable jury believing the government's evidence could find beyond a reasonable doubt that the government proved all the elements of the offenses."). The court must "draw all reasonable inferences in favor of the jury verdict." *United States v. Anderskow*, 88 F.3d 245, 251 (3d Cir. 1996). "The verdict of a jury must be sustained if there is substantial evidence, taking the view most favorable to the Government, to support it." *United States v. Iafelice*, 978 F.2d 92, 94 (3d Cir. 1992) (quotation omitted).

This standard is "highly deferential" toward the jury's verdict. *United States v. Hart,* 273 F.3d 363, 371 (3d Cir. 2001) (citation omitted). "The burden on a defendant who raises a challenge to the sufficiency of the evidence is extremely high." *United States v. Serafini*, 233 F.3d 758, 770 (3d Cir. 2000). An insufficiency finding should be "confined to cases where the prosecution's failure is clear." *United States v. Smith*, 294 F.3d 473, 476 (3d Cir. 2002) (citation omitted). "Only when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt," may the Court overturn the jury's verdict. *United States v. McNeill*, 887 F.2d 448, 450 (3d Cir. 1990) (citation omitted). "To sustain the jury's verdict, the evidence does not need to be inconsistent with every conclusion save that of guilty." *United States v. Gonzalez*, 918 F.2d 1129, 1132 (3d Cir. 1990) (citation omitted). "There is no requirement . . . that the inference drawn by the jury be the only inference possible or that the government's evidence foreclose every possible innocent explanation." *Iafelice*, 978 F.2d at 97.

With regard to the first count of the indictment—conspiracy with intent to distribute more than 500 grams of cocaine—the evidence must be sufficient to prove beyond a reasonable doubt

that: 1) Defendant agreed to distribute cocaine with at least one other person; 2) Defendant joined the agreement knowing of its objective and shared a unity of purpose and intent to achieve that goal with at least one other alleged conspirator; and 3) the weight of the substance containing cocaine was 500 grams or more.  *See United States v. Price*, 13 F.3d 711, 724 (3d Cir. 1994); *United States v. Phillips*, 349 F.3d 138, 143 (3d Cir. 2003) ("The jury must find, beyond a reasonable doubt, the existence of a conspiracy, the defendant's involvement in it, and the requisite drug type and quantity involved in the conspiracy as a whole." (*cert. granted, judgment vacated on other grounds by Barbour v. United States*, 543 U.S. 1102 (2005))); *see also United States v. Bansal*, 663 F.3d 634, 665 (3d Cir. 2011) ("[T]o obtain a conviction under § 846, the government must establish: (1) a unity of purpose, (2) an intent to achieve a common goal, and (3) an agreement to work toward the goal."  (citing *United States v. Iglesias*, 535 F.3d 150, 156 (3d Cir. 2008))).[4]

"The elements of conspiracy . . . can be proven entirely by circumstantial evidence." *United States v. Brodie*, 403 F.3d 123, 134 (3d Cir. 2005) (citing *United States v. Kapp*, 781 F.2d 1008, 1010 (3d Cir. 1986), *cert. denied*, 475 U.S. 1024 (1986)).  "Indeed, the very nature of the crime of conspiracy is such that it often may be established only by indirect and circumstantial evidence." *Id*.  However, a court must, "give close scrutiny to the sufficiency of the government's evidence in a conspiracy case for the reasons that slight evidence of a defendant's connection with a conspiracy is insufficient to support a guilty verdict and guilt must remain personal and

---

[4]       Unlike conspiracy under the general conspiracy statute, 18 U.S.C. § 371, a conspiracy conviction under 21 U.S.C. § 846 does not require proof of an "overt act."  *United States v. Gibbs*, 190 F.3d 188, 197 (3d Cir. 1999) ("We note that it is neither an element of 21 U.S.C. § 846 nor a constitutional requirement that a defendant have committed an overt act in furtherance of the conspiracy." (citing *United States v. Shabani*, 513 U.S. 10, 11 (1994))).   Thus, Defendant's contention that the Government failed to prove an "overt" act taken by one of the Defendants in furtherance of the conspiracy (*see* Reply Br. at 2) is inapposite.

individual.  Conspiracy cannot be proven by piling inference upon inference where those inferences do not logically support the ultimate finding of guilt." *Id*. (internal quotations and citations omitted).

As to the second count of the indictment, "[t]he essential elements of the substantive offense of possession of a controlled substance with intent to distribute are that the defendant (1) knowingly possessed a controlled substance with (2) the intent to distribute it."  *Iglesias*, 535 F.3d at 156.  Intent to distribute may be inferred from the quantity of the drug possessed by the Defendant. *United States v. Rodriguez*, 961 F.2d 1089, 1092 (3d Cir.1992) ("When a defendant is found in possession of a sufficiently large quantity of drugs, an intent to distribute may logically be inferred from the quantity of drugs alone."); *see United States v. Ocampo*, 937 F.2d 485, 488 (9th Cir. 1991) ("Possession of a large quantity of cocaine alone may be sufficient to infer both knowledge and intent.").

### B.  Evidence Adduced At Trial

At trial, the Government introduced evidence that showed the following:  On March 29, 2011, at approximately 11:00 a.m., Damion Barrett and Rasheed David entered the "pre-clearance" area of the Henry Rohlsen Airport in St. Croix, United States Virgin Islands.  App. at 15.[5]  Rasheed David passed through pre-clearance without incident.  *Id*. at 87-88.  Damion Barrett, however, did not.  *Id*. at 14-15.[6]  When Barrett presented himself for inspection, Officer McSween determined that Barrett was traveling from St. Croix to San Juan, Puerto Rico, on a

---

[5]     According to Officer Verlon McSween of the U.S. Customs and Border Protection Agency, pre-clearance is a screening area through which anyone flying from St. Croix to the United States mainland must pass.  Pre-clearance is essentially the same process through which one would go upon reentering the United States from a foreign country.  App. at 14.

[6]     The jury was shown surveillance footage of Barrett and David entering pre-clearance at about the same time and David proceeding through while Barrett was stopped by Officer McSween.  Gov. Exs. 20-21, 24 & 25.

flight that left around noon, and then on to Orlando, Florida.  *Id*.  At first, Barrett appeared "cool" and "calm."  *Id*. at 16.  However, after Officer McSween began to question him about his destination, residence, and the purpose of his trip, Barrett "started to get nervous."  *Id*. When Officer McSween asked Barrett where he had stayed on St. Croix, Barrett responded that "he don't know."  *Id*.  Barrett informed Officer McSween that he was traveling on his days off and had been on St. Croix for only two days.  *Id*.  At that point, Barrett began "avoiding eye contact" and "stuttering his voice."  *Id*.  Officer McSween also asked Barrett if he was traveling alone, to which Barrett responded in the negative.  *Id*. at 18.  Because of Barrett's nervous behavior, "vague" answers to McSween's questions, and the short duration of his trip, Officer McSween referred Barrett to secondary inspection.  *Id*. at 18-19.[7]

At secondary inspection, McSween continued to ask Barrett questions.  Barrett informed Officer McSween that he had stayed at the home of Rasheed David's grandmother.  *Id*. at 19. Officer McSween asked Barrett who Rasheed David was, and Barrett responded that David was his co-worker at Jet Blue Airlines. *Id*. at 19-20. When asked if he was traveling with David that day, Barrett responded "no."  *Id*. at 20.  Barrett's baggage was screened, and no contraband was found.  *Id*. at 20.  During this process, Barrett's cell phone rang, and Officer McSween advised him that he was not allowed to answer it.  *Id*.

Officer McSween then asked Barrett to empty his pockets.  *Id*. at 21.  In the process of emptying his pockets, Barrett lifted his shirt with his hands.  *Id*.  At that point, Officer McSween "noticed a bulge in his crotch area."  *Id*.  Barrett's cell phone then rang a second time, and Officer McSween again advised that he could not answer it.  *Id*.

---

[7]     Officer McSween testified that "secondary inspection" is a "location behind the primary area where we inspect baggage and we do further examination of a person who cannot be cleared on primary process now to the flight. It's . . . a place where you go more in depth and do a little search in your system for any information on the subject."  App. at 18.

Officer McSween informed his supervisor, Officer Aaron Eugene, about the situation and asked for permission to do a "pat down" on Barrett. *Id*. at 21-22. Officer Eugene approved the request. *Id*. at 22. During the pat down, which occurred in a private room under the supervision of Officer Eugene, Officer McSween "felt a mass in [Barrett's] buttocks area." *Id*. at 23. Officer McSween asked Barrett to remove his pants, and during the ensuing search, discovered four "oval shaped object[s] in Saran Wrap" in Barrett's "buttocks and crotch area." *Id*.[8] Officers McSween and Eugene then did a test of one of the oval objects, which came back positive for cocaine. *Id*. at 24. The cocaine was later tested by a chemist, who testified at trial that it weighed 1,010 grams and was 79 percent pure. *Id*. at 65.

Upon discovering the cocaine on Barrett, Officer Eugene then conducted a computer search to determine whether there were any "possible co-travelers" accompanying Barrett. *Id*. at 79. Officer Eugene "learned that there was another subject possibly with the same exact itinerary . . . Rasheed David." *Id*. at 79-80. The itineraries of Barrett and David were "exactly the same" and reflected that both of them were Jet Blue employees traveling from St. Croix to San Juan and then to Orlando, Florida, on the same flights. *Id.* at 80.

Rasheed David, who, at this point, was waiting in the passenger lounge area to board his flight to San Juan, was retrieved by security personnel and brought to secondary inspection. *Id*. at 81. He was searched, but no contraband was found on his person. *Id*. U.S. Customs and Border Protection agents then conducted a drug-dog narcotic sweep of the lounge area where David had been waiting for his flight. *Id*. at 39. During a search of the men's bathroom in the waiting area, Officer Glenn Rogers discovered "a white brick shaped object with clear saran wrap over it" in one trash bin and "two oval shaped objects with the same white powdery

---

[8]        Specifically, Officer McSween discovered "two . . . in front by his balls area" and "two . . . in the middle of the crack of his behind." *Id*. at 23.

substance in the clear saran wrap" in an adjacent trash bin. *Id*. at 40-41.[9] The objects tested positive for the presence of cocaine. *Id.* at 46. The cocaine was later tested by a chemist, who testified that it weighed 1,489 grams and was 80.3 percent pure. *Id*. at 63.

After the cocaine was discovered in the bathroom, Rasheed David was arrested and read his *Miranda* rights. *Id*. at 132. During an interview with Special Agent Yusuf Adeen of the U.S. Customs and Border Protection Agency, David admitted that: 1) he had known Barrett for about two years; 2) they work together at Jet Blue; 3) they had travelled to St. Croix together and had done so on previous occasions; and 4) they had stayed together at the home of David's grandmother. *Id*. at 134-35. David also provided his cell phone number. *Id*. at 136. David was then strip searched. The search revealed that, underneath his baggy pants, he was wearing three pairs of tight fitting spandex-type underwear and a pair of regular boxer shorts. *Id*. at 138-40.[10]

At trial, the jury was shown surveillance footage of the pre-clearance, secondary inspection, and passenger lounge areas. *See* Gov. Exs. 24-29. The jury also heard testimony from a Sprint employee, Roseann Killian, pertaining to telephone calls made to and from David's cell phone on March 29, 2011. App. at 99-107; *see also* Phone Records, Gov. Ex. 18. Killian's testimony, the telephone records, and the surveillance footage revealed the following series of events: Barrett was referred to secondary inspection at approximately 11:00 a.m. Gov. Ex. 20. David entered the passenger lounge area at 11:04 a.m. and sat near the Cape Air gate area. App. at 89. At 11:05 a.m., David was no longer visible on the surveillance footage. *Id*. at 90. Between 11:07 and 11:15 a.m., David's cell phone called Barrett's cell phone three times. At 11:16 a.m., David reappeared on the surveillance footage and was seen walking from the

---

[9]     Pictures of the objects containing cocaine as they were found in the trash bins were admitted into evidence. *See* Gov. Exs. 6-8; App. at 43-45.

[10]    At trial, the Government introduced the three pairs of spandex-type underwear and the boxer shorts into evidence. *See* Gov. Ex. 14.

direction of the men's bathroom in the lounge area towards a different seating location than where he had previously been sitting.  *Id.*  At 11:25 a.m., David was seen being escorted back to secondary inspection by law enforcement officers.  *Id.* at 91.

### C. Analysis

#### 1.  Count II

When viewed in the light most favorable to the Government and making all reasonable inferences in favor of the verdict, the evidence presented to the jury is sufficient to sustain David's conviction under Count II, possession of 500 grams or more of cocaine with intent to distribute.[11]  Because the Government must show that David "knowingly possessed" the cocaine, the key issue for this charge is the link between David and the drugs found in the men's bathroom.  *Iglesias*, 535 F.3d at156.  The Court concludes that the jury was provided sufficient evidence to make that connection.

First, the sequence of events places David in the immediate vicinity of the men's bathroom where the cocaine was found.  At 11:04 a.m., David entered the passenger lounge and sat down; at 11:05 a.m., David was no longer visible on the surveillance footage; David made three unanswered telephone calls to his travel companion between 11:07 a.m. and 11:15 a.m.; and at 11:16 a.m., David can then be seen on surveillance footage walking away from the area of the same bathroom where the cocaine was ultimately found.

---

[11]     Defendant's memorandum in support of his Motion for Acquittal addresses only whether the evidence was sufficient to sustain the possession with intent to distribute conviction under an aiding and abetting theory.  Def. Br. at 9-10.  However, because the evidence is sufficient to sustain Defendant's conviction as a principal, without resorting to an aiding and abetting theory, the Court will not address Defendant's aiding and abetting arguments. *See United States v. Starnes*,  583 F.3d 196, 207 n.5 (3d Cir. 2009) ("Because we conclude that there was sufficient evidence to sustain Starnes's convictions on Counts One through Three as a principal, we need not address his contention that the evidence was insufficient to sustain his convictions on the same counts as an aider and abettor.").

Second, there was substantial evidence linking David to the cocaine.  David and Barrett were coworkers, friends, and travel companions, and had stayed together at the home of David's grandmother the night before the flight.  The bags of cocaine found in the men's bathroom and in Barrett's groin area were wrapped similarly and were of similar purities – 79 and 80.3 percent respectively.[12]  From this, the jury reasonably could have inferred that the drugs came from the same source.  *See United States v. Cunningham*, 517 F.3d 175, 179 (3d Cir. 2008) (fact that "crack was packaged in pink-topped vials that were identical to the ones recovered from Cunningham's customer in the silver BMW . . . allowed the jury to infer that Cunningham's drugs and the drugs in the backpack came from a common source, and that Cunningham knew about the drugs in the backpack."); *United States v. Fierro*, 38 F.3d 761, 768-69 (5th Cir. 1994) ("The following evidence . . . supports the convictions of all defendants on all counts: * * * The bag, which had been seen previously in Martinez's possession, contained four kilograms of cocaine that was of similar purity to the cocaine seized from the stash house.").

Further, David's friend and travel companion (Barrett) was caught by law enforcement with four ovals filled with cocaine in his groin area.  When David was arrested, he was found to be wearing three pairs of tight fitting underwear under his boxer shorts.  When viewed as a whole, the jury reasonably could have inferred from the evidence and the sequence of events that David had been hiding the cocaine found in the men's bathroom in his underwear, just like his friend and travel companion, Damion Barrett, and that David threw it away in the trash bins in the men's bathroom after Barrett failed to emerge from the security line or answer his cell phone. *See Cunningham*, 517 F.3d at 179 (finding that "the sequence of events allowed the jury to infer"

---

[12]     The jury was shown pictures of the objects found on Barrett's person and in the men's bathroom.  *See* Gov. Exs. 4 & 4(b).  The oval wrapped objects found in the men's bathroom and those found on Barrett's person appear nearly identical.  *Id*.

that defendant knew of existence of drugs and that he constructively possessed them); *see also Bansal*, 663 F.3d at 665; *Iglesias*, 535 F.3d at 156.

Finally, the quantity of cocaine found in the bathroom, 1,489 grams, was sufficient for the jury to infer that David intended to distribute it. *Rodriguez*, 961 F.2d at 1092; *see also United States v. Watts*, 306 Fed. Appx. 805, 808 (3d Cir. 2009) (unpublished) (finding that jury could infer intent to distribute when defendant was found transporting 998.5 grams of cocaine in his car).

### 2. Count I

The evidence is also sufficient to sustain David's conviction for conspiracy to distribute cocaine. A conspiracy conviction requires proof of: 1) a unity of purpose; 2) an intent to achieve a common goal; and 3) an agreement to work toward the goal. *Bansal*, 663 F.3d at 665. Here, the jury reasonably could have inferred that David and Barrett agreed to transport cocaine from St. Croix to Orlando, Florida, and shared a common goal and intent to do so.

First, there was evidence that, when Barrett was in secondary inspection, he lied to Officer McSween in stating that he was not traveling with David, when the airport computer system indicated that they had identical itineraries, and David later acknowledged that they were, in fact, travel companions. The jury could have inferred from Barrett's inaccurate answer that he was attempting to protect David from detection by law enforcement. *See United States v. Tyson*, 653 F.3d 192, 210 (3d Cir. 2011) (noting that "Co-conspirator A may serve as a lookout for co-conspirator B" was an example of "coordinated action in support of a common goal."); *United States v. Haddad*, 976 F.2d 1088, 1093 (7th Cir. 1992) (statement made by defendant which was an "attempt[] to mislead government officials by fingering" someone other than his friend as a drug supplier was evidence that conspiracy was ongoing at time statement was made); *accord*

*United States v. Scull*, 321 F.3d 1270, 1283 (10th Cir. 2003) (inference of defendant's membership in conspiracy supported by evidence that he attempted to evade law enforcement surveillance).  Similarly, the jury could have relied on the three telephone calls placed by David to Barrett shortly before David was seen coming from the vicinity of the men's bathroom as evidence of an attempt by David to determine whether the conspiracy was in danger of detection. *See United States v. Mercado*, 610 F.3d 841, 849 (3d Cir. 2010) (pattern of telephone calls between defendant and drug dealer on day of alleged drug sale supported defendant's conviction for aiding and abetting distribution of heroin).[13]

Second, the cocaine found in the bathroom (which the jury reasonably could have inferred was possessed by David) and the cocaine found in Barrett's groin area were wrapped similarly and were of similar purities.  From this, the jury reasonably could have inferred that the drugs came from the same source and that David and Barrett were part of the same drug

---

[13]  Citing *United States v. Thomas,* 114 F.3d 403 (3d Cir. 1997)*,* David argues that because the calls went unanswered and therefore had no content, the jury could not have reasonably relied on them as evidence of a conspiracy.  In *Thomas*, the Third Circuit held that the jury could not permissibly rely only on telephone calls between the defendant and an alleged co-conspirator to establish that the defendant knew that a suitcase possessed by the alleged co-conspirator contained drugs.  *Id*. at 406.  The Court "noted the Government's case *depended* on the jury inferring that the caller informed Thomas that there was cocaine in the suitcase" and determined that it was "'speculative to conclude that Thomas knew that drugs were involved and that we could not uphold a jury verdict based on speculation alone." *Mercado*, 610 F.3d at 847 (quoting *Thomas,* 114 F.3d at 306) (emphasis added).  In *Mercado*, the Third Circuit noted that its holding in *Thomas* "*narrowly* prohibits jurors from inferring that a defendant gained knowledge of the subject of an illegal conspiracy based on the existence of a call *alone*."  *Id*. (emphasis added).  Further, in *Thomas* "[t]here was no evidence of a prior relationship between the defendant and the coconspirators." *United States v. Boria*, 592 F.3d 476, 483 (3d Cir. 2010) (citing *Thomas*, 114 F.3d at 405).

Here, the jury did not need to rely on the telephone calls alone as the source of David's knowledge of the subject of the conspiracy.  As discussed herein, that inference arises from the evidence that David and Barrett travelled and stayed together, possessed similarly wrapped cocaine and of similar purities, and used the same method of transporting the cocaine (in their underwear).  The telephone calls are simply further circumstantial evidence of attempted coordination between David and Barrett and are not the only link between David and the conspiracy.  *Cf. Thomas,* 114 F.3d at 306.

distribution conspiracy. *See United States v. Jackson,* 610 F.3d 1038, 1044 (8th Cir. 2010) ("The presence of distributable amounts of drugs in Jackson's car that were packaged in the same manner and in a similar container as the drugs inside the house further shows that Jackson and Rhodes had an agreement to possess the drugs with the intent to distribute them."); *United States v. Iriarte-Ortega*, 113 F.3d 1022, 1024 (9th Cir. 1997) (fact that defendants drove different trucks containing marijuana "similarly packaged in silver foil and plastic wrap" supported inference of conspiracy to distribute marijuana); *see also United States. v. Davenport,* 220 Fed. Appx. 374, 378 (6th Cir. 2007) (unpublished) ("the fact that the several amounts of meth were of the same purity constituted circumstantial evidence from which the district court could reasonably infer that all the meth came from the same source . . . the truck from which Davenport and Wilson admittedly stole the meth together"); *United States v. Bravo-Morales*, 1989 WL 18809, at *2 (9th Cir. 1989) (unpublished) (facts that defendant were found transporting cocaine of similar purities – 94%, 95%, and 96% pure – and "[a]ll three loads of cocaine were similarly wrapped and similarly packaged" sufficient to prove that defendants "were part of a single common conspiracy."); *Cunningham*, 517 F.3d at 179; *Fierro*, 38 F.3d at 768-69.

Third, the unique method by which David and Barrett transported the cocaine is circumstantial evidence of their agreement and shared unity of purpose. *See Tyson*, 653 F.3d at 209 ("We have previously explained that where several alleged co-conspirators engage in coordinated, "unusual acts," one may reasonably infer the existence of a tacit agreement."). Barrett was found with four ovals of cocaine in his groin area. David was wearing three pairs of tight fitting underwear when he was apprehended. The jury reasonably could have inferred that David had walked through the inspection area with the cocaine found in the men's bathroom

(two ovals and one brick) concealed in his underwear, like Barrett. The use of similar smuggling methods suggests coordination by David and Barrett and is circumstantial evidence of an agreement. *Id*. at 210; *see United States v. Mubayyid*, 658 F.3d 35, 58 (1st Cir. 2011) (affirming conviction for conspiracy to commit tax fraud and finding that evidence that defendants made consistent misrepresentations on tax forms "strong circumstantial evidence that the defendants were operating under an implicit agreement."); *United States v. Shea*, 211 F.3d 658, 665 (1st Cir. 2000) (pointing to evidence of "a common and continuing aim, *similar methods of operation*, continuity in personnel, and interdependence" to prove conspiracy) (emphasis added); *see also Iriarte-Ortega*, 113 F.3d at 1024 ("Coordination between conspirators is strong circumstantial proof of agreement; as the degree of coordination between conspirators rises, the likelihood that their actions were driven by an agreement increases.").

Citing *United States v. Tyson*, 653 F.3d 192 (3d Cir. 2011), David argues that the evidence, at best, shows only parallel conduct, and that the Government established no link between David and Barrett, other than that they knew each other, and three unanswered telephone calls from David to Barrett on the day in question. Def. Br. at 8-9. In *Tyson*, the Third Circuit held that "[a] conspiracy prosecution requires more" than just "proof of parallel conduct." *Tyson*, 653 F.3d at 210. There, the Government was prosecuting Tyson for a conspiracy to traffic firearms into the Virgin Islands. The evidence consisted of proof that:

> Tyson and Morrell flew from the Virgin Islands to Tennessee on February 13, 2008. Morrell stayed with Tyson in his Bristol residence for one week. Tyson purchased fourteen semiautomatic firearms in and around Bristol during the week of Morrell's stay. On February 20, Tyson and Morrell traveled back to the Virgin Islands. Both checked luggage containing firearms. Finally, when Tyson flew back to St. Thomas on July 31, Morrell was waiting at the airport to pick him up.

*Id*. at 208-209. The Court found that this evidence was insufficient to show a conspiracy because it failed to show a "link between the co-conspirators' conduct that suggests integration or unity of

purpose." *Id*. at 210.[14]

Here, there is significantly more evidence linking David and Barrett's illegal conduct than was present in *Tyson*. As discussed above, the cocaine found in the men's bathroom that the jury reasonably could have inferred that David had hid in his multiple pairs of tight fitting underwear was wrapped similarly to and was of a similar purity as the cocaine found in Barrett's groin area. The evidence was sufficient to show that David and Barrett used the same smuggling method and that the cocaine came from the same source. This conduct more than *suggests* joint planning and preparation. *Id*. Further, the *Tyson* Court stated that evidence of one person serving as a lookout for another person "suggests integration or unity of purpose." *Id*. In this case, there was evidence that Barrett attempted to divert suspicion away from David. When questioned at secondary inspection by Officer McSween if he was traveling with David, Barrett lied and said "no."[15] The jury reasonably could have found that this was an attempt by Barrett to "look out"

---

[14]     Tyson and his alleged co-conspirator, Morell, were tried jointly. Notably, after the Government rested its case against Tyson, it elicited testimony from Morell that "Tyson paid at least $800 of the cost for him to fly from St. Thomas to Tennessee. Morrell also admitted on cross examination that during his stay in Tennessee he (1) accompanied Tyson to at least one gun store; (2) visited a firing range with Tyson; and (3) posed for photographs at Tyson's residence, guns in hand." *Id*. at 210. The Third Circuit acknowledged that the Government claimed that this testimony was "critical" proof of the conspiracy, but nonetheless held that it could not consider this evidence because it "was admitted after the close of the government's evidence." *Id*. Because the district court had reserved its ruling on Tyson's Motion for Acquittal until the close of all evidence under Fed. R. Crim. P. 29(b), "Tyson is . . . entitled to a verdict based only upon a snapshot of the evidence as it existed when the government concluded its case-in-chief." *Id*. (citing *United States v. Moore*, 504 F.3d 1345, 1347 (11th Cir. 2007)). It is thus unclear whether the outcome in *Tyson* would have been the same had the Third Circuit considered this additional evidence.

[15]     In his memorandum, Defendant argues that "[t]here was no evidence presented of Mr. Barrett serving as a look out for Defendant or vice versa." Def. Br. at 8. Defendant repeats this argument in his reply memorandum. Reply Br. at 2. However, as discussed above, there was evidence that Barrett attempted to deceive Officer McSween into believing that he was not travelling with David, when in fact, he was. The Government made specific reference to this evidence in its closing argument (App. at 234) and in its Opposition Memorandum (Gov. Br. at 6), but Defendant does not address nor acknowledge this evidence in either of his memoranda.

for, or protect, David from detection by law enforcement, thus "suggest[ing] integration or unity of purpose." *Id*. *Tyson* does not, therefore, alter this Court's conclusion that the evidence was sufficient to sustain David's conspiracy conviction.

### 3.   Conclusion

In view of the foregoing, the guilty verdicts of the jury on Counts I and II must be sustained because, when viewed in the light most favorable to the Government and drawing all reasonable inferences in favor of the verdicts, there is substantial evidence to support them. *See Wolfe*, 245 F.3d at 261; *Iafelice*, 978 F.2d at 94. David's Motion for Acquittal must therefore be denied.

### III.   MOTION FOR NEW TRIAL

During the rebuttal portion of the Government's closing argument, the prosecutor stated: "This is just about facing responsibility and owning up to your actions, that's all. Mr. David was faced with the responsibility, he has to own up to his actions -- There is just no way that I see . . . [Defendant objects]." App. at 235. Defendant objected and at sidebar, argued that this was an improper closing in that the Government was impermissibly "suggesting that David needed to plead guilty;" that Defendant had a Constitutional right to go to trial; and that "she [the prosecutor] cannot impede on that ideal in a suggestion that he needed to plead guilty." Supp. Trial Trans., Dkt. No. 89 at 4. The Court overruled the objection finding that the statement did not infringe on David's right to a jury trial. *Id*. at 4-6.[16]

In his Motion for a New Trial, Defendant argues that the challenged comment was tantamount to stating "that he should not have exercised his constitutional right to remain silent." Def. Br. at 13. He moves for a new trial on the basis that the prosecutor's comment infringed on

---

[16]     At sidebar, Defendant did not ask for a corrective instruction or move for a mistrial. Supp. Trial Trans., Dkt. No. 89 at 4-6.

his Fifth Amendment right not to testify and his Sixth Amendment right to a trial by jury.

## A. Applicable Legal Principles

In determining whether a prosecutorial comment warrants a new trial, courts conduct a two part test.  First, a court must look to see if the remark was improper.  *United States v. Wood*, 486 F.3d 781, 786 (3d Cir. 2007) ("To find that the court abused its discretion in failing to order a mistrial for prosecutorial misconduct, we must first be convinced that the prosecution did in fact misconduct itself.").  In *Griffin v. State of California*, the Supreme Court held "that the Fifth Amendment, in its direct application to the Federal Government ... forbids either comment by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt." 380 U.S. 609, 615 (1965). "A remark is directed to a defendant's silence when 'the language used was manifestly intended or was of such character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify.'" *United States v. Brennan*, 326 F.3d 176, 187 (3d Cir. 2003) (quoting *Griffin*, 380 U.S. at 615).

A comment may also be improper if it "invite[s] the jury to view Defendant disfavorably for exercising his constitutional right to plead not guilty and have a trial." *United States v. Tarallo*, 380 F.3d 1174, 1194 (9th Cir. 2004) (citing *Bordenkircher v. Hayes*, 434 U.S. 357, 363 (1978)); *see also United States v. Piperi*, 1996 WL 661104, at *9 (5th Cir. 1996) (unpublished) (finding that "prosecutor's comment on the failure to plead guilty … was clearly improper.").  In determining whether a comment is improper, it must be "[e]xamined in context." *United States v. Brown*, 254 F.3d 454, 464 (3d Cir. 2001); *see also United States v. Young*, 470 U.S. 1, 12 (1985) (a prosecutor's comment "must be examined within the context of the trial . . .").

If the comment was improper, the court must then determine whether it warrants a new trial.  *Wood*, 486 F.3d at 789 ("[a] mistrial is not required where improper remarks were

harmless."); *see also United States v. Weekes*, 224 Fed. Appx. 200, 206 (3d Cir. 2007) (unpublished) ("We analyze these and the remaining comments in two steps: [W]e must first be convinced that the prosecution did in fact misconduct itself . . . If we find misconduct, we then apply harmless error analysis.") (internal quotations and citations omitted). An improper comment warrants a new trial "only if the defendant was prejudiced by the remarks in question." *United States v. Helbling*, 209 F.3d 226, 241 (3d Cir. 2000). "In determining prejudice, [the court] consider[s] the scope of the objectionable comments and their relationship to the entire proceeding, the ameliorative effect of any curative instructions given, and the strength of the evidence supporting the defendant's conviction." *Id.* (quotation omitted).

When the improper comment involves the violation of a constitutional right, the comment is prejudicial unless it was "harmless beyond a reasonable doubt." *United States v. Molina-Guevara*, 96 F.3d 698, 703 (3d Cir. 1996) (citing *Chapman v. State of California*, 386 U.S. 18, 24 (1967)). "A constitutional error is harmless where it can be 'prove[d] beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'" *Virgin Islands v. Martinez*, 620 F.3d 321, 337 (3d Cir. 2010) (quoting *Chapman*, 386 U.S. at 24).

### B.  Analysis

In his Reply, Defendant summarizes his argument:

> A plain reading of the prosecutor's remarks indicate that the Government argued that Defendant should have affirmatively done something; that thing being accepting responsibility.  In order to accept responsibility he would have to speak.  As such, this comment directly referred to Defendant's right to remain silent . . . Further, by "accepting responsibility" there would be no trial.  The Government's comments also attacked Defendant's decision to exercise his constitutional right to trial . . . The Government's arguments improperly imposed a burden on Defendant, that burden being the duty to accept responsibility.

Reply Br. at 5.

When viewed in the context of the entire trial, the challenged comment cannot reasonably

be said to have infringed on Defendant's Fifth Amendment right not to testify or his Sixth Amendment right to a trial by jury.  *See Brown*, 254 F.3d at 464 (prosecutor's comment must be viewed in context).  The prosecutor began her opening statement with "[t]his case is really about the one that almost got away."  App. at 5.  At trial, the evidence showed that, while Barrett was apprehended in the airport's pre-clearance area, David had passed through pre-clearance and was detained by law enforcement in the passenger lounge area, approximately one hour before his flight to Puerto Rico was scheduled to depart.  During her initial closing argument, to which Defendant did not object, the prosecutor stated that "Rasheed David almost escaped apprehension that day.  He almost got away with it. And this is about him accepting responsibility.  We believe that we have presented the case in this that will support a finding of guilty – And we ask that you find and return a verdict of guilty on both charges." App. at 216. The challenged comment – "[t]his is just about facing responsibility and owning up to your actions, that's all. Mr. David was faced with the responsibility, he has to own up to his actions" – occurred at the end of the rebuttal portion of the Government's closing argument.[17]  Viewed in context of the evidence adduced at trial, the prosecutor's opening statement, and the first part of her closing argument, the most reasonable and obvious interpretation of the challenged comment is that it was a plea to the jury to make David "fac[e] responsibility" for his actions by finding him guilty, not an invitation for the jury to draw a negative inference from David's choice not to testify or plead guilty.  *Donnelly v. DeChristoforo*, 416 U.S. 637, 647 (1974) ("a court should not lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning

---

[17]     During a sidebar conference following Defendant's objection to the challenged comment, the prosecutor explained that the comment was intended as a follow up to her earlier comments— that Defendant was the one who "almost got away, so now it's judgment time, time to accept responsibility."  Supp. Trial Trans. at 5, Dkt. No. 89.  At sidebar, the Court overruled Defendant's objection on the grounds that it did not interpret the challenged comment as a remark on Defendant's election to go to trial or not plead guilty.  *Id.*

or that a jury, sitting through lengthy exhortation, will draw that meaning from the plethora of less damaging interpretations."); *see also Brown*, 254 F.3d at 464; *Young*, 470 U.S. at 12.

A prosecutor's remark is improper only when it was "manifestly intended or was of such character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify," *Brennan*, 326 F.3d at 187, or it "invite[d] the jury to view Defendant disfavorably for exercising his constitutional right to plead not guilty and have a trial." *Tarallo*, 380 F.3d at 1194.  Cases that have found prosecutorial comments to be improper remarks on a defendant's right not to testify or not plead guilty illustrate that "naturally and necessarily" means that the remark must be obviously linked to the defendant's constitutional rights.  *See, e.g., United States v. Drescher*, 77 Fed. Appx. 45, 48 (2d Cir. 2003) (unpublished) (finding improper, but nonetheless harmless beyond a reasonable doubt, prosecutor's remarks during rebuttal closing argument that defendant "'doesn't want to' take responsibility" like his coconspirator "*who had pleaded guilty* and testified for the government . . .  [and] *had taken responsibility for his criminal conduct*" followed by comment that "*[I]t's time for [defendant] to take responsibility for the crimes he has committed*. That's where you come in. It's time because you have the power to decide that [defendant] is guilty beyond a reasonable doubt") (emphasis added); *United States v. Smith*, 934 F.2d 270, 275 (11th Cir. 1991) (finding that "closing argument to the jury that Smith 'has not taken responsibility for his actions' *because he refused to plead guilty*, whereas his co-defendants entered guilty pleas" was an improper argument) (emphasis added); *see Piperi*, 1996 WL 661104, at *9 (finding that "prosecutor's comment on the failure to plead guilty … was clearly improper."); *United States v. Johnson*, 1 M.J. 213, 215 (C.M.A. 1975) (finding improper, but not prejudicial because of curative instruction, statement by prosecutor that defendant "*didn't come forward to the Government and say, I want to plead*

*guilty*, and that's what you saw with Shaw and Cummings. They made a deal with the Government, and they plead guilty to one of the charges . . . *But have you found anything like that in the accused today*? Did he once say, I'm guilty, I learned my lesson? . . . The other people have at least taken that first step. They have said, I'm guilty. He hasn't. Even though he admitted kicking, even though he admitted beating, *he hasn't yet said he's guilty.*") (emphasis added and internal quotations omitted); *accord Griffin*, 380 U.S. at 610 (finding court's instruction at sentencing phase improper that "[a]s to any evidence or facts against him which the defendant can reasonably be expected to deny or explain because of facts within his knowledge, if he does not testify or if, though he does testify, he fails to deny or explain such evidence, the jury may take that failure into consideration as tending to indicate the truth of such evidence and as indicating that among the inferences that may be reasonably drawn therefrom those unfavorable to the defendant are the more probable."); *Lesko v. Lehman*, 925 F.2d 1527, 1540 (3d Cir. 1991) (finding that prosecutor's remark at death penalty sentencing proceeding infringed on defendant's Fifth Amendment right against self-incrimination, when he stated that "John Lesko took the witness stand, and you've got to consider his arrogance. He told you how rough it was, how he lived in hell, and *he didn't even have the common decency to say I'm sorry for what I did.* I don't want you to put me to death, but I'm not even going to say that I'm sorry.") (emphasis added).

Here, any link between the prosecutor's comment and Defendant's constitutional rights is so tenuous that the jury would not "naturally and necessarily" interpret the comment as directed toward Defendant's rights not to testify and to insist on a trial by jury. *Brennan*, 326 F.3d at 187. The chain of inferences required to interpret the challenged comment as a remark on the fact that Defendant did not take the stand or plead guilty is too weak to overcome the much more obvious

22

and simpler meaning understood by the Court at trial and urged by the Government at sidebar and in its Opposition—that the jury should find Defendant guilty.  *Brennan*, 326 F.3d at 187 ("remarks about the defense's failure to call anyone who knew anything about the case" not a comment on defendant's failure to testify); *Bontempo v. Fenton,* 692 F.2d 954, 958 (3d Cir. 1982) (finding that jury would not "naturally and necessarily take it to be a comment on the failure of the accused to testify" because "there was no direct reference in the summations to Bontempo's refusal to take the stand . . ."); *Tarallo*, 380 F.3d at 1194 (comment by prosecutor during closing that cooperating witness who took the stand was "somebody who has accepted responsibility for what he did, who has admitted to you, 'Yes, I lied. I lied. I knew these were lies, and I continued to make them'" was not a comment on defendant's right not to testify or right to a trial by jury); *cf. Lesko*, 925 F.2d at 1544 (finding link between prosecutor's comments and defendant's Fifth Amendment right against self-incrimination because prosecutor "parodied the gist of Lesko's testimony: 'I don't want you to put me to death, but I'm not even going to say that I'm sorry.'").  Accordingly, the Court finds that the prosecutor's comment was not improper.

Assuming *arguendo* that the comment was improper—an assumption that the discussion above establishes is unwarranted—it was not prejudicial as to warrant a new trial.  In determining prejudice, the court must consider "the scope of the objectionable comments and their relationship to the entire proceeding, the ameliorative effect of any curative instructions given, and the strength of the evidence supporting the defendant's conviction." *Helbling*, 209 F.3d at 241.  Here, the fact that Defendant's allegation of prosecutorial misconduct consists of this lone comment— made in the course of a three-day trial, including an extensive closing argument—weighs against a finding of prejudice.  *See Wood*, 486 F.3d at 789 (finding no prejudice when "the challenged comment was only a single sentence in the prosecutor's entire

closing argument, which continued at some length after he made his comment."); *United States v. Rivas*, 493 F.3d 131, 140 (3d Cir. 2007) (finding no prejudice when "the remark was a single sentence in the middle of a perfectly permissible line of argument against the defense's impeachment strategy.  It is clear that it did not affect the outcome of the trial.").

Further, although no specific curative instruction was given (and notably, none was requested by Defendant, *see* Supp. Trial Trans. at 5, Dkt. No. 89), the jury was instructed that it must base its verdict "only on the evidence that you saw and heard in the courtroom," (App. at 180), and was repeatedly instructed during the trial that arguments of counsel are "not evidence." *See* Preliminary Instructions, Dkt. No. 77-1 at 58 ("What is said in closing arguments is not evidence, just as what is said in the opening statements is not evidence, it's the argument of counsel); *id*. at 60 ("The statements and arguments of the lawyers for the parties in the case is not evidence."); App. at 180 ("The following are not evidence, the indictment, statements and arguments of the lawyers for the parties in this case . . ."); *id*. at 182 ("During closing arguments, the lawyers may call your attention to certain facts or factual conclusions that they deem important. However, what the lawyers say is not evidence and is not binding on you.").  Courts have found that similar instructions mitigated any prejudice flowing from improper comments. *See Wood,* 486 F.3d at 789 (finding no prejudice from improper comment when "[t]hough it is true that the district court did not charge the jury with an expressly curative instruction, it did state to the jury that opening and closing statements made by counsel were not considered evidence, and that the jury must base its verdict on only the evidence presented."); *see also United States v. Fell,* 531 F.3d 197, 221 (2d Cir. 2008) (repeated instruction that counsel's arguments were not evidence mitigated alleged prejudice from prosecutor's comments that defendant's crimes "are all about evasion, about escape, about trying to avoid responsibility for

24

what he did."); *Tarallo*, 380 F.3d at 1194 (prosecutor's comment that "came somewhat closer to implying that Defendant was somehow dishonorable for exercising his right to a jury trial" was not prejudicial, in part, because "the district court's instructions to the jury reminded the jury that, in reaching its verdict, it was to consider only the evidence presented during the trial, and that the arguments of counsel, including closing arguments, [are] intended to help you interpret the evidence, but [they] are not evidence.").

Moreover, although not in the context of a specific curative instruction, the jury was also repeatedly instructed that David was cloaked with the presumption of innocence and had no obligation to testify or to prove that he is not guilty.   *See* App. at 187-88 ("The Defendant, Rasheed David, pleaded not guilty to the offenses charged, Rasheed David is presumed to be innocent . . . The presumption of innocence means that Rasheed David has no burden or obligation to present any evidence at all or prove that he is not guilty."); *id.* at 204 ("Rasheed David did not testify in this case.  A defendant has an absolute constitutional right not to testify . . . You must not attach any significance to the fact that Rasheed David did not testify.  You must not draw any adverse inference against him because he did not take the witness stand."); *see also id.* at 236; Preliminary Instructions at 67, Dkt. No. 77-1.

Finally, as discussed above, the evidence of Defendant's guilt was substantial, and thus the prosecutor's comment could not have affected the verdict.   Accordingly, because the relevant prejudice factors strongly militate against a finding of prejudice, the Court finds that any error regarding the challenged statement is harmless beyond a reasonable doubt.  *See Wood*, 486 F.3d at 789 (finding that factors weighed against a finding of prejudice and that "we are certain beyond any possible doubt that the prosecutor's comment could not have affected the verdict and thus if there was an error in the district court, whether by the prosecutor or the court, it was

harmless."); *United States v. Gambone*, 314 F.3d 163, 180 (3d Cir. 2003) ("Thus, the first and third factors weigh very strongly in the government's favor. As a result, even though no specific curative instruction was provided to the jury, we hold that the error was harmless beyond a reasonable doubt, and the Gambones are not entitled to a new trial by reason of the prosecutor's comments."); *see also Rogers v. Kerns*, 2010 WL 5579808, at *13 (S.D. Ohio 2010) ("The state's comment on [defendant's] not guilty plea was consequently improper . . . Regardless, we do not believe that the improper conduct prejudicially affected the substantial rights of appellant. The state of the evidence was such that appellant was not deprived of a fair trial, and the court instructed the jury both on the effect of the not guilty plea and that counsel's arguments were not evidence. Appellant's fourth assignment of error is overruled.").

In view of the foregoing, the Court finds that the challenged comment by the prosecutor during the rebuttal portion of the closing argument did not infringe on Defendant's Fifth or Sixth Amendment rights.  Moreover, even in the unlikely event that the comment could somehow be construed as improper, it was not prejudicial so as to warrant a new trial.

## IV.    CONCLUSION

For the reasons discussed above, the Court finds that the evidence presented at trial was sufficient to sustain Defendant's convictions for possession with intent to distribute more than 500 grams of cocaine and conspiracy with intent to distribute more than 500 grams of cocaine. The Court also finds that Defendant is not entitled to a new trial.  Accordingly, Defendant's "Motion for Judgment of Acquittal or in the Alternative New Trial" is **DENIED**.  An appropriate Order accompanies this Opinion.

Date: June 4, 2012

                                   _____/s/_____
                                   WILMA A. LEWIS
                                   District Judge